In re WAITE et al.

(District Court, D. Maryland. May 25, 1915.)

1. BANKRUPTCY ☞407—GROUNDS FOR REFUSAL OF DISCHARGE—OBTAINING CREDIT BY FALSE STATEMENT.

Bankr. Act July 1, 1898, c. 541, § 14b (3), 30 Stat. 550 (Comp. St. 1913, § 9598), provides for the denial of a discharge if the bankrupt has obtained money or property on credit upon a materially false statement in writing made to obtain such credit. Upon the death of one partner it was agreed between the surviving partners that the capital of the deceased partner on the books of the firm should be credited to his estate as a liability, and it was so carried on the firm books. This indebtedness was omitted from annual statements of its financial condition furnished banks as a basis for accommodations given the partnership by them. At the time the N. Bank acquired the assets of one of such banks, one of the partners had an interview with the president, and claimed to have told him that the firm had borrowed the capital of the deceased partner; but such indebtedness was omitted from an annual statement subsequently made, upon the faith of which the N. Bank extended credit. Such statement showed a large excess of assets over liabilities, though on the face of the firm's books the firm was insolvent. *Held*, that this omission required the denial of a discharge, though the president was told what the partner claimed to have told him, and it was not excused by the partners' belief that the debt would not be presented, so as to embarrass them, or by the fact that the annual statement was made in the same form customary before such partner's death.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 729-731, 737, 738, 740-751, 758, 760, 761; Dec. Dig. ☞407.]

2. BANKRUPTCY ☞407—GROUNDS FOR REFUSAL OF DISCHARGE—OBTAINING CREDIT BY FALSE STATEMENT.

A member of such firm, in charge of the selling end of its business and claiming to know nothing of its books or accounts, but who signed one of the annual statements prior to that on which the N. Bank extended credit, and from which such indebtedness was omitted, was equally responsible with his partner for the presentation of the false statement to the N. Bank, and was not entitled to a discharge, as, however slight his knowledge of the firm's books, he knew the firm owed such debt, and must have known its approximate amount.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 729-731, 737, 738, 740-751, 758, 760, 761; Dec. Dig. ☞407.]

3. BANKRUPTCY ☞405—DISCHARGE—REFUSAL—ESTOPPEL.

The N. Bank, by objecting to the allowance of the claim of the estate of the deceased partner on the ground that the capital was not loaned to the firm, but was left with the surviving partners at the risk of their business, was not estopped to object to the discharge, there having been no determination of the issues raised by the objection to such claim and

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the position of no one having been changed by it, as the partners were liable to the estate, whatever the rights of general creditors as against the claim of the estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 709–711; Dec. Dig. 405.]

4. BANKRUPTCY 407—GROUNDS FOR REFUSAL OF DISCHARGE—OBTAINING CREDIT BY FALSE STATEMENT.

A partnership, whose books showed it to be insolvent, as a basis for accommodations from banks, made annual statements of its financial condition from which one large item of indebtedness was omitted. The N. Bank acquired the assets of one of such banks, and as soon as it became a creditor of the partnership began pressing for a reduction of the indebtedness, which was thereafter reduced to some extent whenever notes held by it matured. A few days before the maturity of each note the partnership would present a new note for a smaller amount, which would be discounted and the proceeds passed to its credit, and a check would thereafter be drawn for the payment of the old note, there thus being in form a payment of the old loan and the contracting of a new loan. *Held*, that while for many purposes, and when necessary to do justice between the parties, such transactions are regarded as the mere renewal or continuance of an existing indebtedness, there was such an extension of credit in reliance on the financial statements as required the denial of a discharge in bankruptcy, under Bankr. Act, § 14b (3), as, whenever a note matured, the bank, until it agreed to renew it, had a right to insist upon payment in full, and probably would have exercised such right, had it known that the books of the partnership showed it to be insolvent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 729–731, 737, 738, 740–751, 758, 760, 761; Dec. Dig. 407.]

In the matter of J. Herbert Waite and another, individually and as copartners trading as John Turnbull, Jr., & Co., bankrupts. On objections to the bankrupts' discharge. Discharge denied.

Venable, Baetjer & Howard and Charles McHenry Howard, all of Baltimore, Md., for National Bank of Baltimore.

Edward M. Hammond and Charles W. Wisner, Jr., both of Baltimore, Md., for bankrupts.

ROSE, District Judge. [1] J. Herbert Waite and Daniel H. Doyle, individually and as copartners, trading as John Turnbull, Jr., & Co., are in bankruptcy. They will be referred to as the bankrupts. The First National Bank of this city, hereafter called the Bank, is one of their creditors. It has objected to their discharge on the ground that they obtained money from it on credit upon a knowingly false statement furnished by them to it. Prior to September 19, 1910, the firm of John Turnbull, Jr., & Co. consisted, in addition to the present bankrupts, of John Turnbull, Jr., and Samuel R. Waite. On that day the former died. The surviving partners formed a new copartnership. The written agreement into which they then entered provided that on the books of the firm the capital of the deceased partner should be credited to his estate as a liability due to it. Samuel R. Waite died in December 1912. The present bankrupts thereupon adopted the former articles of copartnership, with some minor alterations not here material. For a number of years the successive copartnerships had been

borrowers from various banks. The firm was in the habit of handing them annually statements of its financial condition as a basis for the accommodation they might give it until a new statement was furnished. It closed its books as of the 31st of January in each year, and its statements always spoke as of that date, although they were not made up or furnished to the banks until some time later. Any loans or extensions which the banks might make the bankrupts between the receipt of one statement and its successor would ordinarily be in part at least based upon the assumption that the former truthfully disclosed the firm's condition on that 31st of January upon which it bore date.

The president of the bank has testified that the bank, in discounting the notes now held by it, relied upon the statement of January 31, 1914. Lenders of money and sellers of merchandise, when they get a statement from a borrower or a buyer, sometimes require him to stipulate that, until he notifies them of some change which should be made in it, they shall be entitled to rely on it as a substantially accurate summary of his financial condition whenever he borrows or buys. Questions of how far and how long the debtor is bound by such an agreement occasionally arise. But there are none of them in the instant case. The charge here is, not that the condition of the bankrupts changed for the worse between the time they furnished the statement and the dates at which their various notes now held by the bank were discounted for them by it, but that when they gave such statement to it they knew it was false, both as to their condition on the day it bore date and on the day it was delivered to the bank.

Four successive annual statements were made between the death of Turnbull and the bankruptcy. In none of them was the amount owing his estate included among the liabilities, although in accordance with the express agreement of the partners it was charged as such on the firm's books. On the 31st of January, 1914, the amount of this indebtedness was $105,172.39. The statement as of that date given the banks by the bankrupts showed their assets to amount to $196,999.-10 and their liabilities to $96,369.62. If the firm then owed nothing more, its net worth would have been $100,629.48, and such the statement purported to show it was. In point of fact, the firm was then insolvent on the face of its own books to the extent of $4,542.91, being the difference between the apparent excess of its assets over liabilities, as shown by its statement, and the amount of its indebtedness to the Turnbull estate.

Prior to December, 1913, there had been no business relations between the bankrupts and the bank. In the last-mentioned month the bank acquired the assets of the National City Bank, in which the bankrupts had an account, and from which they were borrowers. In that way the bank became the owner of four notes of the bankrupts, for $22,500 in the aggregate. At some time after the account was taken over by the bank, the bankrupt Waite had an interview with its president. At that time Waite was asked about certain matters not shown on the statement, as, for example, the rent of the warehouse used by his firm, how long the lease thereof had still to run, and the approximate amount of its annual sales. Memoranda of the answers to these

questions was made by the president of the bank on the sheet upon which the bankrupts' statements for several years past had been tabulated. Waite testifies that during the conversation he said that Turnbull's will gave his surviving partners the right to borrow his capital until May 15, 1915; that they had exercised that privilege and borrowed the money. He says, however, that he was not asked and did not state what was the amount of the loan from the Turnbull estate. The president of the bank denies that he was ever told that the firm owed the estate anything. His recollection is confirmed by the fact that among the notes made by him on the tabulation referred to there is no reference to any such indebtedness, although it was a matter of far more importance than the date of the expiration of the lease of the bankrupts' warehouse. Had Waite given the information that he now thinks he did, it is inconceivable that the president of the bank would not have asked the amount of the estate's claim. According to Waite, this conversation took place at least two or three months before the statement of January 31, 1914, was given to the bank. I am persuaded that in this matter the recollection of the president of the bank is more accurate than that of Waite. Moreover, even if the latter had said what he now thinks he did, the omission of this large item of indebtedness from the statement would nevertheless have been unjustifiable.

Waite testifies that the item was not included in the statement, because the latter was made out in the same form which had been customary before Turnbull's death, and because he regarded it as a statement of the firm's "working capacity." Before Turnbull's death there was, of course, no liability to him to be included. The bankrupts' belief that the debt would not be pressed, so as to embarrass them, did not justify its omission from the statement of their liabilities. In re Miller (D. C.) 192 Fed. 730; In re Arenson (D. C.) 195 Fed. 609; Josephs v. Powell, 213 Fed. 627, 130 C. C. A. 291.

[2] The firm name to the statement of 1914 was signed by Waite. The bankrupt Doyle had had charge of the selling end of the firm's business. He says he knew nothing of its books or accounts. At first he testified that he had never signed any of the statements; but, when shown that as of January 31, 1913, he admitted that the signature to it was in his handwriting. From that, as from its successor, the indebtedness to the Turnbull estate was omitted. However slight his knowledge may have been of bookkeeping, or of the details of the entries in the firm's books, he was perfectly aware that the firm owed the Turnbull estate, and he could not have been ignorant of the approximate amount of that indebtedness. Under such circumstances he must be held equally responsible with his partner for the presentation of the statement of 1914, which was false only in the same respect as the one made by him the year before had been untrue. The facts sharply distinguish his case from that of the appellant in Frank v. Michigan Paper Co., 179 Fed. 776, 103 C. C. A. 268, 30 L. R. A. (N. S.) 623. If the discharge should be denied to Waite, it must be equally withheld from Doyle. In re Savarese, 209 Fed. 830, 126 C. C. A. 554.

[3] The bankrupts contend that the bank is estopped to say that the statement was false. This contention is based on the fact that in the bankruptcy proceedings the bank has objected to the allowance of the claim of the estate on the ground that Turnbull's capital was not a loan to the bankrupts, but was left with the bankrupts at the risk of their business. There has yet been no determination of the issues raised by this objection. The position of no one has been changed by it. No ground for estoppel has as yet arisen. Whatever may be the rights, if any, of the general creditors of the bankrupts as against the claim of the Turnbull estate, there would seem to be no question that the bankrupts are debtors to that estate. The agreement of copartnership between them and the entries upon their books would appear to place that matter beyond the reach of controversy by them.

[4] The remaining question in the case is of more difficulty. So soon as the bank became a creditor of the bankrupts, it began to press for a reduction of the indebtedness. Whenever a note of the bankrupts fell due, the new note which the bank discounted for them was always either $500 or $1,000 less than the face of the old. As a result, when the voluntary petition in bankruptcy was filed in February, 1915, the aggregate sum due the bank was $13,500, or $9,000 less than it had been in December, 1913, and at least $7,000 less than it had been when the false statement was received by the bank. Under these circumstances the bankrupts say that they obtained no money or property from the bank upon a false statement. A similar, if not identical, contention was held unsustainable by Judge Rellstab in Re Arenson, supra. In that case the bankrupt was a buyer, and the objecting creditor a seller, of merchandise. The bankrupt had been for some time a customer of the creditor. He was in the habit of paying something on his old bill whenever he contracted a new one. At a time when he already owed the creditor a good deal he was called on for a statement. He furnished one which was false and fraudulent. Thereafter he continued to buy merchandise and to make payments on account, with the result that when he went into bankruptcy he owed the creditor a smaller sum than he did when the statement was given. It was held that that circumstance was immaterial. He was refused a discharge. Judge Rellstab said that section 14b included further credit, as well as new or larger credit.

In the case at bar the bankrupts, a few days before the maturity of each note, offered for discount a new one for a smaller amount. The discount was made and passed to their credit. Thereafter they drew a check for the payment of the old note. In form, therefore, there was the payment of an old loan, and the contracting of a new. If the parties had used currency, instead of checks, the case would have been on all fours with In re Arenson, supra. The bank would have given the bankrupts the proceeds of the new note in currency, and on the same day, or, as was usually the case, on a subsequent day, the bankrupts would have brought other bills or coins to the bank to pay off their matured obligation. Nothing of that kind was done. Discount of new note, payment of old, were alike made without any actual currency changing hands. It is true, there never would have been money

858 223 FEDERAL REPORTER

enough in their account in the bank to make good the check for the old note, had not the proceeds of the new been first credited to them, although there was always a balance which might have been applied by the bank on account of the old note, even though no new one had been discounted.

The bankrupts cite cases to show that for many purposes courts have regarded such a series of transactions as the mere renewal or continuance of an existing indebtedness. Whenever, to do justice between the parties, it is necessary to look through the form to the substance, it will be done. But is there any such necessity presented by this case? Whenever a note matured, the bank, until it agreed to renew it, had the right to insist upon being paid in full. It is more than probable that it would have exercised such right, had it known that the books of the bankrupt showed it to be insolvent. It consented, by accepting a new note, to surrender its right to insist on payment for the time during which that note was to run. Was not, or at least may not, the practical effect upon it have been precisely the same as if upon the faith of the false statement it had made an absolutely new loan? Under such circumstances, can the bankrupts be heard to say that the form which they voluntarily gave their dealings with the bank is not binding on them, in order that they may escape the consequences of doing that which may have damaged the bank precisely as much as it would have been damaged, had the form which actually was adopted accurately represented in every respect and from every standpoint what was in fact done? In short, the false statement is clearly such as is in spirit within the condemnation of section 14b (3), and the form which the transactions between the parties took is within its letter. With this conclusion agrees Judge Chatfield, if I correctly understand his decision in Re Wylly (D. C.) 210 Fed. 954.

It follows that the bankrupts are not entitled to a discharge.